1  **LEVI & KORSINSKY LLP**
2  Adam C. McCall (SBN 302130)
   445 South Figueroa Street, 31st Floor
3  Los Angeles, CA 90071
   Tel:  (213) 985-7290
4  Fax: (202) 333-2121
   Email: amccall@zlk.com
5
6  *Attorney for Plaintiff Palkon*

7  *[Additional Counsel on Signature Page]*

8
   **IN THE UNITED STATES DISTRICT COURT**
9  **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

10 DENNIS PALKON, On Behalf of Himself and )  Case No.
11 All Others Similarly Situated,          )
                                           )  COMPLAINT FOR VIOLATION OF THE
12            Plaintiff,                    )  SECURITIES EXCHANGE ACT
                                           )
13      v.                                 )  CLASS ACTION
                                           )
14 NETSUITE INC., ZACHARY NELSON, EVAN     )  DEMAND FOR JURY TRIAL
15 GOLDBERG, JAMES MCGEEVER, BILLY         )
   BEANE, DEBORAH A. FARRINGTON,           )
16 CATHERINE KINNEY, KEVIN THOMPSON,       )
   EDWARD J. ZANDER, STEVE GOMO,           )
17 ORACLE CORPORATION, OC                  )
   ACQUISITION LLC, and NAPA               )
18 ACQUISITION CORPORATION,                )
                                           )
19          Defendants.                    )

20
   **COMPLAINT FOR VIOLATION OF SECTIONS 14(A) AND 20(A)**
21 **OF THE SECURITIES EXCHANGE ACT OF 1934**

22     Plaintiff, by his undersigned attorneys, for this complaint against defendants, alleges upon
23
   personal knowledge with respect to himself, and upon information and belief based upon, *inter*
24
   *alia*, the investigation of counsel as to all other allegations herein, as follows:
25
   **NATURE OF THE ACTION**
26
27     1.     This action stems from a proposed transaction announced on July 28, 2016 (the
28

"Proposed Transaction"), pursuant to which NetSuite Inc. ("NetSuite" or the "Company") will be acquired by Oracle Corporation ("Ultimate Parent"), OC Acquisition LLC ("Parent"), and its wholly-owned subsidiary, Napa Acquisition Corporation ("Merger Sub," and together with Ultimate Parent and Parent, "Oracle").

2.     On July 28, 2016, NetSuite's Board of Directors (the "Board" or "Individual Defendants") caused the Company to enter into an agreement and plan of merger (the "Merger Agreement").  Pursuant to the terms of the Merger Agreement, Oracle commenced a tender offer, set to expire on September 15, 2016, and stockholders of NetSuite will receive $109.00 per share in cash.

3.     On August 18, 2016, defendants issued materially incomplete disclosures in the Solicitation/Recommendation Statement (the "Solicitation Statement") filed with the United States Securities and Exchange Commission ("SEC") in connection with the Proposed Transaction.  The Solicitation Statement fails to disclose material information regarding the Proposed Transaction.

4.     Accordingly, plaintiff alleges herein that defendants violated Sections 14(e), 14(d), and 20(a) of the Securities Exchange Act of 1934 (the "1934 Act") in connection with the Solicitation Statement.

**JURISDICTION AND VENUE**

5.     This Court has jurisdiction over all claims asserted herein pursuant to Section 27 of the 1934 Act because the claims asserted herein arise under Sections 14(e), 14(d), and 20(a) of the 1934 Act and Rule 14a-9.

6.     This Court has jurisdiction over defendants because each defendant is either a corporation that conducts business in and maintains operations within this District, or is an individual with sufficient minimum contacts with this District so as to make the exercise of

jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

7.      Venue is proper under 28 U.S.C. § 1391 because a substantial portion of the transactions and wrongs complained of herein occurred in this District.

## PARTIES

8.      Plaintiff is, and has been continuously throughout all times relevant hereto, the owner of NetSuite common stock.

9.      Defendant NetSuite is a Delaware corporation and maintains its principal executive offices at 2955 Campus Drive, Suite 100, San Mateo, California 94403.  NetSuite's common stock is traded on the NYSE under the ticker symbol "N."

10.      Defendant Zachary Nelson ("Nelson") is a director of NetSuite and has served as Chief Executive Officer ("CEO") since 2002.

11.      Defendant Evan Goldberg ("Goldberg") is a director, co-founder, Chairman of the Board, and Chief Technology Officer ("CTO") of NetSuite.

12.      Defendant James McGeever ("McGeever") is a director, President, and Chief Operating Officer ("COO") of NetSuite.

13.      Defendant Billy Beane ("Beane") is a director of NetSuite.

14.      Defendant Deborah A. Farrington ("Farrington") is a director of NetSuite. According to the Company's website, Farrington is Chair of the Compensation Committee and a member of the Audit Committee and the Nominating and Governance Committee.

15.      Defendant Catherine Kinney ("Kinney") is a director of NetSuite.  According to the Company's website, Kinney is Chair of the Nominating and Governance Committee and a member of the Audit Committee.

CLASS ACTION COMPLAINT

16. Defendant Kevin Thompson ("Thompson") is a director of NetSuite. According to the Company's website, Thompson is a member of the Audit Committee and the Compensation Committee.

17. Defendant Edward J. Zander ("Zander") is a director of NetSuite. According to the Company's website, Zander is a member of the Compensation Committee and the Nominating and Governance Committee.

18. Defendant Steve Gomo ("Gomo") is a director of NetSuite. According to the Company's website, Gomo is Chair of the Audit Committee.

19. The defendants identified in paragraphs 10 through 18 are collectively referred to herein as the "Individual Defendants."

20. Defendant Ultimate Parent is a Delaware corporation and a party to the Merger Agreement.

21. Defendant Parent is a Delaware limited liability company and a party to the Merger Agreement.

22. Defendant Merger Sub is a Delaware corporation, a wholly-owned subsidiary of Parent, and a party to the Merger Agreement.

## CLASS ACTION ALLEGATIONS

23. Plaintiff brings this action as a class action on behalf of himself and the other public stockholders of NetSuite (the "Class"). Excluded from the Class are defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any defendant.

24. This action is properly maintainable as a class action.

25.   The Class is so numerous that joinder of all members is impracticable.  As of April 29, 2016, there were approximately 80,439,651 shares of NetSuite common stock outstanding, held by hundreds, if not thousands, of individuals and entities scattered throughout the country.

26.   Questions of law and fact are common to the Class, including, among others: (i) whether defendants violated the 1934 Act; and (ii) whether defendants will irreparably harm plaintiff and the other members of the Class if defendants' conduct complained of herein continues.

27.   Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature.  Plaintiff's claims are typical of the claims of the other members of the Class and plaintiff has the same interests as the other members of the Class. Accordingly, plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

28.   The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for defendants, or adjudications that would, as a practical matter, be dispositive of the interests of individual members of the Class who are not parties to the adjudications or would substantially impair or impede those non-party Class members' ability to protect their interests.

29.   Defendants have acted, or refused to act, on grounds generally applicable to the Class as a whole, and are causing injury to the entire Class.  Therefore, final injunctive relief on behalf of the Class is appropriate.

CLASS ACTION COMPLAINT

## SUBSTANTIVE ALLEGATIONS

*Background of the Company and the Proposed Transaction*

30.     NetSuite is a leading vendor of cloud computing business management software suites.   The Company enables companies to manage core key business operations in a single system, which includes Enterprise Resource Planning ("ERP"), Accounting, Customer Relationship Management ("CRM"), and ecommerce. NetSuite's patent-pending "real-time dashboard" technology provides an easy-to-use view into up-to-date, role-specific business information.

31.     The Company was founded in 1998 by Individual Defendant Goldberg and Lawrence J. Ellison ("Ellison").  Ellison is also CTO and Chairman of the board of directors of Oracle, and is Oracle's largest single stockholder.

32.     Shortly before NetSuite's initial public offering in 2007, all of the shares beneficially held Ellison or his affiliates were transferred into NetSuite Restricted Holdings LLC ("NRH"), a limited liability company formed for the purpose of holding those shares and funding charitable gifts as and when directed by Ellison.  The sole member and 100% beneficial owner of NRH is Ellison's revocable trust.

33.     Today, NRH remains as NetSuite's largest stockholder.  NRH beneficially owns 31,964,891 NetSuite shares, which represent approximately 40% of the Company's outstanding shares.

34.     In addition to NetSuite's relationship with Ellison through NRH, NetSuite and Oracle have a significant commercial relationship, and Oracle is a provider of key technology to NetSuite.

35.     Since NetSuite's initial public offering, the relationship between NRH and NetSuite has been primarily governed by NRH's operating agreement.   Under the operating agreement, NRH is required, on most matters, to vote its shares in the same proportion (for, against, withheld, or abstain) as the votes that are collectively cast by all NetSuite stockholders other than (1) NRH; (2) Ellison's spouse, if any, and children and any trust for their benefit; and (3) any person or group filing a Schedule 13D with respect to NetSuite.   However, this proportional voting commitment does not apply with respect to "change of control" matters, including any merger, consolidation, or reorganization in which more than 50% of the outstanding shares are exchanged for cash or securities of another company.

36.     On January 21, 2016, "a senior representative" of Oracle indicated to "a senior representative" of NetSuite that Oracle was potentially interested in acquiring NetSuite.

37.     On January 27, 2016, the Board formed a transactions committee comprised of purportedly independent directors (the "Transactions Committee"): Individual Defendants Farrington, Gomo, and Zander.   Nevertheless, later that day, Individual Defendant Goldberg – Ellison's longtime colleague and co-founder of the Company – discussed the potential acquisition directly with Ellison.

38.     On February 18, 2016, NetSuite entered into an engagement letter with Qatalyst Partners LP ("Qatalyst") to act as financial advisor to the Board and Transactions Committee.

39.     On April 28, 2016, NetSuite issued a press release wherein it announced its first quarter 2016 financial results.   Total revenue for the first quarter of 2016 was $216.6 million, representing a 31% increase over the same period in the prior year.   Cash flows from operations were $31.3 million in the first quarter of 2016, up from $28.0 million in the same period in the prior year.   Non-GAAP net income for the first quarter of 2016 was $9.0 million, or $0.11 per

share, which is comparable to the first quarter 2015 non-GAAP net income.  With respect to the financial results, Individual Defendant Nelson commented:

> NetSuite's fiscal year 2016 started strong with record first quarter results as we grew year-over-year revenue by more than 30 percent for our fifteenth consecutive quarter[.] Our financial results, and the results we are delivering for more than 10,000 companies operating around the globe, are driven by a new approach to building business software and by fantastic execution by our nearly 5,000 employees around the world.

40.     On May 5, 2016, NetSuite and Oracle entered into a confidentiality agreement.

41.     On June 1, 2016, Oracle submitted an indication of interest to acquire NetSuite for $100.00 per share in cash.

42.     On July 13, 2016, Oracle submitted its "best and final" offer to acquire NetSuite for $109.00 per share in cash and stated that NetSuite would need to enter into an exclusivity agreement to move forward with the deal.

43.     Later that day, the Board met and determined that NetSuite should enter into the exclusivity agreement with Oracle, despite the fact that the Board did not contact a single other potential bidder.

44.     The parties quickly entered into the exclusivity agreement and negotiated the terms of the Merger Agreement and Support Agreement (defined below), and executed the Merger Agreement on July 28, 2016.

***The Merger Agreement***

45.     On July 28, 2016, the Board caused the Company to enter into the Merger Agreement, pursuant to which NetSuite will be acquired for inadequate consideration.

46.     The Individual Defendants have all but ensured that another entity will not emerge with a competing proposal by agreeing to a "no solicitation" provision in the Merger Agreement that prohibits the Individual Defendants from soliciting alternative proposals and severely

constrains their ability to communicate and negotiate with potential buyers who wish to submit or

have submitted unsolicited alternative proposals.  Section 7.02(a) of the Merger Agreement states:

(a) Neither the Company nor any of its Subsidiaries shall, nor shall the Company or any of its Subsidiaries authorize or permit any of its or their Representatives to, and the Company shall instruct, and cause each applicable Subsidiary to instruct its vice presidents and higher officers, its finance and legal management and its financial and legal advisors not to, directly or indirectly, solicit, initiate or knowingly take any action to facilitate or encourage the submission of any Acquisition Proposal or the making of any inquiry, offer or proposal that would reasonably be expected to lead to any Acquisition Proposal, or, subject to Section 7.02(b), (i) conduct or engage in any discussions or negotiations with, disclose any non-public information relating to the Company or any of its Subsidiaries to, afford access to the business, properties, assets, books or records of the Company or any of its Subsidiaries to or otherwise cooperate in any way with, or knowingly assist, participate in, facilitate or encourage any effort by, any Third Party that is seeking to make, or has made, any Acquisition Proposal, or (ii)(A) amend or grant any waiver or release under any standstill or similar agreement with respect to any class of equity securities of the Company or any of its Subsidiaries, or (B) approve any transaction under, or any Third Party becoming an "interested stockholder" under, Section 203 of Delaware Law, (iii) enter into any agreement in principle, letter of intent, term sheet, acquisition agreement, merger agreement, option agreement, joint venture agreement, partnership agreement or other Contract relating to any Acquisition Proposal (other than a confidentiality agreement contemplated by Section 7.02(b)) or enter into any agreement or agreement in principle requiring the Company to abandon, terminate or fail to consummate the transactions contemplated hereby or breach its obligations hereunder, or (iv) resolve, propose or agree to do any of the foregoing.  Without limiting the foregoing, it is understood that any violation of the foregoing restrictions by any Subsidiary of the Company or Representatives of the Company or any of its Subsidiaries shall be deemed to be a breach of this Section 7.02 by the Company.  The Company shall, and shall cause its Subsidiaries and its and their respective Representatives to cease immediately and cause to be terminated, and shall not authorize or knowingly permit any of its or their Representatives to continue, any and all existing activities, discussions or negotiations, if any, with any Third Party conducted prior to the date hereof with respect to any Acquisition Proposal and shall use its reasonable best efforts to cause any such Third Party (or its agents or advisors) in possession of non-public information in respect of the Company or any of its Subsidiaries that was furnished by or on behalf of the Company and its Subsidiaries to return or destroy (and confirm destruction of) all such information.

CLASS ACTION COMPLAINT

47.     Further, the Company must advise Oracle, within twenty-four hours, of any proposals or inquiries received from other parties.   Section 7.02(c) of the Merger Agreement states, in relevant part:

> The Company shall notify Parent promptly (but in no event later than 24 hours) after any of the Company's executive officers, board members or financial advisor obtains knowledge of the receipt by the Company (or any of its Representatives) of any Acquisition Proposal, any inquiry, offer or proposal that would reasonably be expected to lead to an Acquisition Proposal, or any request for non-public information relating to the Company or any of its Subsidiaries or for access to the business, properties, assets, books or records of the Company or any of its Subsidiaries by any Third Party, in each case in connection with any Acquisition Proposal or inquiry, offer or proposal that would reasonably be expected to lead to an Acquisition Proposal.  In such notice, the Company shall identify the Third Party making, and the material terms and conditions of, any such Acquisition Proposal, inquiry, offer, proposal or request.  Commencing upon the provision of any notice referred to above, the Company shall (A) on a reasonable and prompt basis, advise Parent (or its counsel) of the progress of negotiations concerning any Acquisition Proposal, the material resolved and unresolved issues related thereto and any other material matters identified with reasonable specificity by Parent (or its counsel) and the material details (including material amendments or proposed amendments as to price and other material terms) of any such Acquisition Proposal, request or inquiry and (B) promptly upon receipt or delivery thereof, provide Parent (or its outside counsel) with copies of all material documents and material written or electronic communications embodying, describing or amending any such Acquisition Proposal (including the financing thereof), request or inquiry exchanged between the Company, its Subsidiaries or any of their respective officers, directors, employees or Representatives, on the one hand, and the Person making an Acquisition Proposal or any of its Affiliates, or their respective officers, directors, employees, or Representatives, on the other hand.  The Company shall promptly provide Parent with any non-public information concerning the business, present or future performance, financial condition or results of operations of the Company (or any of its Subsidiaries), provided to any Third Party that was not previously provided to Parent.  The Company shall provide Parent with at least 48 hours' prior notice (or such lesser period of prior notice provided to the members of the Transaction Committee or the Company Board) of any meeting of the Transactions Committee or the Company Board at which the Transactions Committee or the Company Board is reasonably expected to consider any Acquisition Proposal.

48.     Moreover, the Merger Agreement contains a highly restrictive "fiduciary out" provision permitting the Board to withdraw its approval of the Proposed Transaction under

10

CLASS ACTION COMPLAINT

extremely limited circumstances, and grants Oracle a "matching right" with respect to any "Superior Proposal" made to the Company.  Section 7.02(d) of the Merger Agreement provides:

> (d) Neither the Company Board nor any committee thereof shall (i) fail to make, withdraw, amend or modify, or publicly propose to withhold, withdraw, amend or modify, in a manner adverse to Parent or Merger Subsidiary, the Board Recommendation, (ii) approve, endorse, adopt or recommend, or publicly propose to approve, endorse, adopt or recommend, any Acquisition Proposal or Superior Proposal, (iii) fail to recommend against acceptance of any tender offer or exchange offer (other than the Offer or any other tender offer or exchange offer by Parent or Merger Subsidiary) for the Company Common Stock within ten (10) Business Days after the commencement of such offer, (iv) make any public statement inconsistent with the Board Recommendation, (v) resolve or agree to take any of the foregoing actions (any of the foregoing, an "Adverse Recommendation Change"), or (vi) resolve or agree to change or modify the election that this Agreement and the Merger be governed pursuant to Section 251(h) of Delaware Law.  Notwithstanding anything to the contrary in this Agreement, at any time prior to the Acceptance Time, the Company Board, following receipt of and on account of a Superior Proposal, may (i) make an Adverse Recommendation Change or (ii) terminate this Agreement to enter into a definitive agreement with respect to such Superior Proposal in accordance with the terms of Section 9.01(d)(i), but only if, in either case, the Company Board (upon the recommendation of the Transactions Committee) determines in good faith, after consultation with outside legal counsel to the Company Board, that the failure to take such action would be a breach of its fiduciary duties under Applicable Law; provided, however, that the Company Board shall not make an Adverse Recommendation Change or terminate this Agreement in accordance with Section 9.01(d)(i), unless (A) the Company promptly notifies Parent (the "Adverse Recommendation Change Notice"), in writing at least five (5) Business Days before making an Adverse Recommendation Change or terminating this Agreement (the "Notice Period"), of its intention to take such action or actions with respect to a Superior Proposal, it being understood that none of (1) the determination in itself by the Company Board (or a committee thereof) that an Acquisition Proposal constitutes or would reasonably be expected to result in a Superior Proposal, (2) the delivery in itself by the Company to Parent of the notifications required by Section 7.02(c) or of an Adverse Recommendation Change Notice, or (3) the public disclosure of the matters described in clause (1) or (2), will constitute an Adverse Recommendation Change (in each case of clauses (1), (2) and (3), to the extent in accordance with this Agreement); (B) the Company attaches to such notice the most current version of the proposed agreement or a reasonably detailed summary of all material terms of any such Superior Proposal (which version or summary shall be updated on a prompt basis) and the identity of the Third Party making the Superior Proposal; (C) the Company shall, and shall cause its financial and legal advisors to, during the Notice Period, if requested by Parent, negotiate with Parent in good faith to make such adjustments in the terms and conditions of this

Agreement so that such Acquisition Proposal ceases to constitute a Superior Proposal, if Parent, in its discretion, proposes to make such adjustments (it being understood and agreed (x) that in the event that, after commencement of the Notice Period, there is any material revision to the terms of a Superior Proposal, including, any revision in price, the Notice Period shall be extended, if applicable, to ensure that at least three (3) Business Days remains in the Notice Period subsequent to the time the Company notifies Parent of any such material revision and (y) that there may be multiple extensions of the Notice Period); and (D) Parent does not make, within the Notice Period, an offer that is determined by the Company Board (upon the recommendation of the Transactions Committee) in good faith, after consulting with its outside counsel and financial advisor of nationally recognized reputation, to be at least as favorable to the stockholders of the Company as such Superior Proposal.

49.     Further locking up control of the Company in favor of Oracle, the Merger Agreement provides for a "termination fee" of $300 million, payable by the Company to Oracle if the Individual Defendants cause the Company to terminate the Merger Agreement.

50.     By agreeing to all of the deal protection devices, the Individual Defendants have locked up the Proposed Transaction and have precluded other bidders from making successful competing offers for the Company.

51.     Additionally, Oracle entered into Tender and Support Agreements with Individual Defendants Nelson, Goldberg, and McGeever, Ronald Gill ("Gill"), the Company's Chief Financial Officer, and NRH, pursuant to which they will tender their NetSuite shares in the tender offer.  Accordingly, over 43% of the Company's shares are already locked up in favor of the Proposed Transaction.

***Interests of the Company's Officers and Directors***

52.     The Company's officers and directors stand to receive substantial benefits as a result of the Proposed Transaction.

53.     For example, according to the Solicitation Statement, Oracle and its affiliates may be entering into employment agreements with the members of NetSuite's management.

CLASS ACTION COMPLAINT

54.     Individual Defendants Nelson, Goldberg, and McGeever stand to receive $59,842,943, $36,977,257, and $43,276,943, respectively, as a result of the Proposed Transaction.

55.     Gill and Marc Huffman, President, Worldwide Sales and Distribution, also stand to receive $24,475,357 and $15,573,856, respectively.

***The Materially Incomplete and Misleading Solicitation Statement***

56.     Defendants filed the Solicitation Statement with the SEC in connection with the Proposed Transaction.  As alleged below and elsewhere herein, the Solicitation Statement omits material information that must be disclosed to NetSuite's stockholders to enable them to render an informed decision with respect to the Proposed Transaction.

57.     The Solicitation Statement omits material information with respect to the Proposed Transaction.  This omitted information, if disclosed, would significantly alter the total mix of information available to NetSuite's stockholders.

58.     For example, the Solicitation Statement fails to disclose the financial projections provided by NetSuite management and relied upon by Qatalyst for purposes of its analysis, for fiscal years 2016-2021, for the following items: (i) EBITDA; (ii) EBIT (or D&A); (iii) taxes (or tax rate); (iv) capital expenditures; and (v) changes in net working capital.

59.     With respect to Qatalyst's *Illustrative Discounted Cash Flow Analysis*, the Solicitation Statement fails to disclose: (i) how Qatalyst incorporated NetSuite's net operating losses in the analysis; and (ii) the net debt utilized by Qatalyst in the analysis.

60.     With respect to Qatalyst's *Selected Precedent Transactions Analysis*, the Solicitation Statement fails to disclose whether Qatalyst performed any type of benchmarking analysis for NetSuite in relation to the target companies.

61.     The Solicitation Statement also fails to disclose the timing and nature of all communications regarding future employment or directorship of NetSuite's officers and directors, including who participated in all such communications.

## COUNT I

**(Claim for Violation of Section 14(e) of the 1934 Act Against Defendants)**

62.     Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

63.     Section 14(e) of the 1934 Act states, in relevant part, that:

> It shall be unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading . . . in connection with any tender offer or request or invitation for tenders[.]

64.     Defendants disseminated the misleading Solicitation Statement, which contained statements that, in violation of Section 14(e) of the 1934 Act, in light of the circumstances under which they were made, omitted to state material facts necessary to make the statements therein not materially misleading.

65.     The Solicitation Statement was prepared, reviewed, and/or disseminated by defendants.

66.     The Solicitation Statement misrepresented and/or omitted material facts in connection with the Proposed Transaction as set forth above.

67.     By virtue of their positions within the Company and/or roles in the process and the preparation of the Solicitation Statement, defendants were aware of this information and their duty to disclose this information in the Solicitation Statement.

68.     The omissions and misleading statements in the Solicitation Statement are material in that a reasonable shareholder will consider them important in deciding whether to tender their shares in connection with the Proposed Transaction.  In addition, a reasonable investor will view a

full and accurate disclosure as significantly altering the total mix of information made available in the Solicitation Statement and in other information reasonably available to shareholders.

69.     Defendants knowingly or with deliberate recklessness omitted the material information identified above in the Solicitation Statement, causing statements therein to be materially incomplete and misleading.

70.     By reason of the foregoing, defendants violated Section 14(e) of the 1934 Act.

71.     Because of the false and misleading statements in the Solicitation Statement, plaintiff and the Class are threatened with irreparable harm.

72.     Plaintiff and the Class have no adequate remedy at law.

## **COUNT II**

### **(Claim for Violation of 14(d) of the 1934 Act Against Defendants)**

73.     Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

74.     Section 14(d)(4) of the 1934 Act states:

Any solicitation or recommendation to the holders of such a security to accept or reject a tender offer or request or invitation for tenders shall be made in accordance with such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

75.     Rule 14d-9(d) states, in relevant part:

Any solicitation or recommendation to holders of a class of securities referred to in section 14(d)(1) of the Act with respect to a tender offer for such securities shall include the name of the person making such solicitation or recommendation and the information required by Items 1 through 8 of Schedule 14D-9 (§ 240.14d-101) or a fair and adequate summary thereof[.]

Item 8 requires that directors must "furnish such additional information, if any, as may be necessary to make the required statements, in light of the circumstances under which they are made, not materially misleading."

76.     The Solicitation Statement violates Section 14(d)(4) and Rule 14d-9 because it omits the material facts set forth above, which renders the Solicitation Statement false and/or misleading.

77.     Defendants knowingly or with deliberate recklessness omitted the material information set forth above, causing statements therein to be materially incomplete and thus misleading.

78.     The omissions in the Solicitation Statement are material to plaintiff and the Class, and they will be deprived of their entitlement to make a fully informed decision with respect to the Proposed Transaction if such misrepresentations and omissions are not corrected prior to the expiration of the tender offer.

79.     Plaintiff and the Class have no adequate remedy at law.

### COUNT III

**(Claim for Violation of Section 20(a) of the 1934 Act
Against the Individual Defendants and Oracle)**

80.     Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

81.     The Individual Defendants and Oracle acted as controlling persons of NetSuite within the meaning of Section 20(a) of the 1934 Act as alleged herein.  By virtue of their positions as officers and/or directors of NetSuite and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Solicitation Statement filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that plaintiff contends are false and misleading.

82.     Each of the Individual Defendants and Oracle was provided with or had unlimited access to copies of the Solicitation Statement alleged by plaintiff to be misleading prior to and/or

shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause them to be corrected.

83.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control and influence the particular transactions giving rise to the violations as alleged herein, and exercised the same.  The Solicitation Statement contains the unanimous recommendation of the Individual Defendants to approve the Proposed Transaction.  They were thus directly connected with and involved in the making of the Solicitation Statement.

84.     Oracle also had direct supervisory control over the composition of the Solicitation Statement and the information disclosed therein, as well as the information that was omitted and/or misrepresented in the Solicitation Statement.

85.     By virtue of the foregoing, the Individual Defendants and Oracle violated Section 20(a) of the 1934 Act.

86.     As set forth above, the Individual Defendants and Oracle had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) of the 1934 Act and Rule 14a-9, by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the 1934 Act.

87.     As a direct and proximate result of defendants' conduct, plaintiff and the Class are threatened with irreparable harm.

88.     Plaintiff and the Class have no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment and relief as follows:

A.     Enjoining defendants and all persons acting in concert with them from proceeding

17

CLASS ACTION COMPLAINT

with, consummating, or closing the Proposed Transaction;

B.      In the event defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages;

C.      Directing the Individual Defendants to file a Solicitation Statement that does not contain any untrue statements of material fact and that states all material facts required in it or necessary to make the statements contained therein not misleading;

D.      Declaring that defendants violated Sections 14(e), 14(d), and 20(a) of the 1934 Act, as well as Rule 14a-9 promulgated thereunder;

E.      Awarding plaintiff the costs of this action, including reasonable allowance for plaintiff's attorneys' and experts' fees; and

F.      Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: August 30, 2016

OF COUNSEL:

**RIGRODSKY & LONG, P.A.**
Brian D. Long
Gina M. Serra
2 Righter Parkway, Suite 120
Wilmington, DE 19803
Tel.: (302) 295-5310

**RYAN & MANISKAS, LLP**
Richard A. Maniskas
995 Old Eagle School Road, Suite 311
Wayne, PA 19087
Tel.: (484) 588-5516

**LEVI & KORSINSKY LLP**

By:      *s/ Adam C. McCall*
Adam C. McCall (SBN 302130)
445 South Figueroa Street, 31st Floor
Los Angeles, CA 90071
Tel.:  (213) 985-7290
Fax: (202) 333-2121
Email: amccall@zlk.com

*Attorneys for Plaintiff Palkon*

18